IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**SEBASTIAN T. HALE,**                                    Case No. 1:15 CV 2103

    Plaintiff,                                    Judge John R. Adams

    v.                                    Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                    REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff Sebastian T. Hale ("Plaintiff"), *pro se*, filed a complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated October 21, 2015). Following review, the undersigned recommends the Commissioner's decision denying benefits be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed an application for SSI in December 2011, alleging disability as of January 1, 2005. (Tr. 189-93). The claim was denied initially and on reconsideration. (Tr. 91-93, 99-100). Plaintiff (represented by counsel) and a vocational expert ("VE") testified at an administrative hearing on March 5, 2014. (Tr. 27-65). Following the hearing, an administrative law judge ("ALJ") issued an unfavorable decision finding Plaintiff not disabled. (Tr. 11-21). The Appeals Council granted Plaintiff's request for review of the ALJ's decision. (Tr. 181-84). The agency's

decision became final on September 9, 2015, when the Appeals Counsel issued its unfavorable decision on review. (Tr. 1-9).[1]

## FACTUAL BACKGROUND

Personal Background

Plaintiff's date of birth is September 30, 1964. (Tr. 189). He has a high school education and past work experience as a laborer in the construction industry. (Tr. 30-31). At the time of the hearing, he lived alone. (Tr. 33).

---

1. The Commissioner correctly asserts:

> The only substantive revision made by the Appeals Council was to reverse the ALJ's reopening of the denial of a prior claim filed by Plaintiff (Tr. 4-5). The Appeals Council found that there was no good cause provided for reopening the claim, and accordingly, that Plaintiff's December 2011 application for SSI benefits only pertained to the period from the date of that application (December 21, 2011) through March 24, 2014, the date of the ALJ's decision (Tr. 4-5). Plaintiff does not challenge the Appeals Council's determination here.

(Doc. 19, at 2 n.1).

Relevant Medical Evidence[2]

Plaintiff complained of sharp intermittent chest pain in January 2007, but denied shortness of breath and had "[n]o cardiac history." (Tr. 511-12). He also complained of "very atypical left shoulder pain". (Tr. 513). Plaintiff was advised to lose weight and quit smoking. *Id.*

In June 2007, Plaintiff received a heart monitor due to his diagnosis of atrial fibrillation. (Tr. 526). A few months later, in August 2007, Plaintiff complained of heart palpitations and doctors decided to repeat the heart monitor due to lost data and confirm his enrollment in a Coumadin clinical trial. (Tr. 533-34).[3]

In November 2007, Plaintiff complained of a headache, but reported no nausea, vomiting, or visual changes. (Tr. 542). He was diagnosed with a headache and discharged. (Tr. 542-45). Later that month his diagnoses included cardiac dysrhythmia, obesity, and hypertension. (Tr. 546). Results from the August heart monitor revealed "pac's and pvc's no atrial fibrillation

---

2. In the fact section of his brief, Plaintiff lists a variety treating source facilities and dates of treatment, and directs the Court to "also see attached CD", which he submitted with his brief. (Doc. 14, at 1 & attached CD). He asserts a disability finding "is supported by the evidence documented [in his brief] and on the CD attached hereto." (Doc. 14, at 7). The Court is unable to decipher the contents of the password-protected CD because Plaintiff failed to provide the password. However, to the extent the information on the CD is different than the information in the transcript; the Court is unable to consider this evidence. This Court's review is limited to whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997); *see also Franson v. Comm'r of Soc. Sec.*, 556 F. Supp.2d 716, 725 (W.D. Mich. 2008) ("The court cannot consider evidence that was not submitted to the ALJ in the sentence four context.") Further, Plaintiff does not request a sentence-six remand or in any way even suggest the evidence on the CD is "new". *See Hollon v. Comm'r of Soc.*, 447 F.3d 477, 483-84 (6th Cir. 2001); 42 U.S.C. § 405(g).

3. Plaintiff took Coumadin for stroke prevention. (Tr. 548). During regular follow-up visits from 2011 to 2014 he largely had no associated symptoms. On all but three visits he had results within the "INR Target Range". (Tr. 684, 691, 698, 702, 706, 713, 717, 721, 725, 729, 736, 740, 744, 751, 755, 759, 771 (below target range), 777, 781, 788, 792 (below target range), 796, 803, 807, 811, 815, 822, 826, 830, 834, 838, 845, 849, 853, 860, 864, 868, 872, 876, 880, 891, 895, 883, 909 (reported feeling achy, but nothing specific), 913, 1181, 1185, 1015 (below target range), 1017, 1019, 1022, 1025, 1029, 1033, 1041, 1048, 1052, 1059, 996, 1253, 1118, 1270.

detected". (Tr. 548). He reported "[o]ccasional heart flutters [but] no sustained symptoms since last visit", denied syncope, and was "[f]eeling well [a] from cardiac standpoint". *Id.* He was advised to "[t]ake medications as directed". (Tr. 549). At this time it was "[u]nclear if [Plaintiff] need[ed] to be on coumadin". (Tr. 581).

On January 3, 2008, Plaintiff went to the emergency room due to pain in his left side, upper back, and left ankle. (Tr. 551-52). His pain was "intermittant [sic] and not associated with activity", appearing to be musculoskeletal. (Tr. 553). Upon discharge, he was advised to take Tylenol and apply heat. *Id.* Plaintiff was "taking his medication as prescribed" at this time. *Id.*

In March 2008, Plaintiff complained of increased urinary frequency, headache, vision problem, and hyperglycemia. (Tr. 558). Diagnoses included type 2 diabetes, severe obesity, atrial fibrillation, and hyponatremia. (Tr. 563). He returned to the emergency room the same month complaining of right hand numbness. (Tr. 568-69). The doctor noted "This patient was seen in derm and had a blood sugar in the 300 range. Attempts by me to contact patient were unsuccessful and a letter was sent for the patient to make an appointment. He subsequently developed polyuria and polydipsia." (Tr. 569). Plaintiff's blurred vision, thirst, and urination problems improved with medication and treatment. *Id.* At the end of the month he returned to the emergency room complaining of chest pain, as well as pain and numbness in his left arm. (Tr. 574).

Plaintiff complained of chest discomfort in November 2008, possibly due to his medications. (Tr. 610). He had no associated shortness of breath, nausea, vomiting, or diaphoresis. (Tr. 613). Plaintiff reported quitting smoking several years prior. *Id.* An EKG revealed normal sinus rhythm, and he was diagnosed with atypical chest pain and GERD. (Tr. 614, 616).

At a heart examination on December 12, 2008, Keith L. Kruithoff, M.D. noted "[t]he rhythm was NSR with premature atrial contractions seen throughout the recording"; "[n]ormal LV size and function with mild concentric LVH"; "[t]he calculated left ventricular ejection fraction 63%"; and "[t]here are no valvular abnormalities present." (Tr. 627). Plaintiff's chronic problem list included diabetes mellitus 2 (uncontrolled), obesity, anemia, atrial fibrillation, arthropathy, arthritis of the lower leg, benign hypertension, lipoma (skin and subcutaneous tissue), functional disorder of the stomach, urethritis, and a "historical problem". (Tr. 363).

Later in December 2008, Plaintiff complained of knee pain and stiffness for over a year, exacerbated by activity. (Tr. 631-32). He was assessed with osteoarthritis of the right knee. (Tr. 632). Plaintiff declined physical therapy, a referral to an orthopedic surgeon, and an injection. *Id.* He was advised to perform home exercises/water exercises, apply heat, and lose weight. (Tr. 632-33). Also in December 2008, Plaintiff complained of headache, dizziness, and upset stomach. (Tr. 352).

On February 23, 2009, Plaintiff complained of arm pain, chest discomfort, and shoulder pain. (Tr. 347). He was diagnosed with a shoulder strain. *Id.* At a heart examination the following month, at which he was diagnosed with atrial fibrillation, Plaintiff was "not taking medications as directed." (Tr. 341).

A chest x-ray taken April 29, 2009, was unremarkable with no acute change from a September 2008 x-ray. (Tr. 420). The following day Plaintiff complained of chest pain radiating down his left arm and hand. (Tr. 645, 657). He was discharged after an echocardiography stress test yielded normal results. (Tr. 328, 333-34, 658-59, 662).

In July 2009, he complained of right knee pain once a week with intensity of 10/10, but denied any weakness or locking. (Tr. 322-23). An ace wrap was applied. (Tr. 322). An

examination revealed the right knee had generalized pain with extension, but no effusion, point tenderness, or "drawer or V/V instability." (Tr. 324). The impression was knee pain and degenerative joint disease. *Id.*

At an October 21, 2009 heart examination, Plaintiff complained of achy arm pain that woke him up after he stretched his arm out. (Tr. 442). He was assessed with uncontrolled hypertension and doctors "discussed medication compliance" and recommended a low salt diet, weight loss, and exercise. (Tr. 447).

Plaintiff went to the hospital on November 17, 2009, complaining of palpitations, flu-like symptoms, and chest pain. (Tr. 292). He was "[a]dmittedly not complaint with diabetic diet and blood sugar monitoring." (Tr. 293). The record revealed he was a smoker with occasional marijuana use. *Id.* He was treated for his symptoms, and advised to stop smoking and follow up with his primary care physician. (Tr. 294-95).

In January 2010, Plaintiff complained of left arm pain and numbness, and chest pain. (Tr. 277, 448). Doctors ruled out ischemia and determined the atypical chest pain and left arm numbness was likely muscular. (Tr. 285-86). A chest x-ray revealed borderline cardiomegaly. (Tr. 416). A CT scan of the brain revealed "[m]ild chronic sinus disease" but "[n]o acute hemorrhage or extra-axial fluid collection". (Tr. 417). X-rays of the right knee revealed "[m]oderate to moderately severe degenerative change, without significant advancement from prior examination of October 8, 2008." (Tr. 419). He was discharged home with a prescription for regular insulin injections, an appointment for an eye exam, and nutritional counseling. (Tr. 281, 458).

On March 9, 2010, Plaintiff had an appointment for follow up of his diabetes mellitus, including a dilated eye exam (though he reported no vision problems). (Tr. 465). He was

diagnosed with diabetes mellitus (without retinopathy), "blepharitis OU", and "glaucoma suspect". (Tr. 468).

Plaintiff complained of left sided chest pain on August 31, 2010, which was worse with breathing and movements and radiated to his shoulder. (Tr. 495). Doctors prescribed pain medication for the atypical chest pain and advised him to "[u]se heating pad, warm shower, massage to prevent stiffness or muscle spasm". (Tr. 497).

At a follow-up visit in January 2011, Plaintiff reporting taking his medication (including Coumadin) as directed and he was feeling "pretty good". (Tr. 768).

At the end of June 2011, Plaintiff had a regular heart rate, regular rhythm, normal extremities, and no edema. (Tr. 696).

On March 1, 2011, Plaintiff was tolerating medicine "ok when taking." (Tr. 774). At this time, Plaintiff weighed more than 350 pounds. *Id.* He was advised to work on a low sodium and low fat diet, weight loss, and exercise. (Tr. 775).

At a medication refill visit on May 19, 2011, with regard to his insulin it was noted: "[w]hen remembers both doses, sugar good but sometimes high in AM when forgets evening insulin." (Tr. 785). The next month, Plaintiff had a follow-up appointment for diabetes. (Tr. 800). He was taking his medication as directed and tolerating it "ok". *Id.*

At an office visit on August 29, 2011, it was noted Plaintiff had "comorbid conditions" of diabetes mellitus and hypertension. (Tr. 819). An examination revealed regular heart rate and rhythm, and trace edema. (Tr. 820).

October 24, 2011, Plaintiff complained of shortness of breath and chest pain. (Tr. 733, 842). He described dull and sharp pain of 6/10. (Tr. 733). He had regular heart rate and rhythm, and no edema. (Tr. 734). Treatment providers determined the chest pain was related to recent

exertion. *Id.* Plaintiff was advised to apply heat and avoid heavy lifting, pushing, or pulling with the left side for two weeks. *Id.*

On November 1, 2011, Plaintiff reported skipping his lunch dosage of medication, and was advised to stop consuming sugary drinks at night. (Tr. 503).

The following month, he had a follow-up appointment for hypertension. (Tr. 748, 857). The record reveals his blood sugar had been high, and he sometimes forgot to take his insulin. (Tr. 748). Plaintiff stated he had a sore shoulder since suffering a fall a month prior. *Id.* A physical examination revealed a full range of motion in both shoulders, but some tenderness in the right shoulder. (Tr. 749). He was advised to use warm compresses and stretch. *Id.* Plaintiff was assessed with diabetes mellitus (without mention of complication), benign essential hypertension, mixed hyperlipidemia, esophageal reflux, and joint pain in the shoulder. (Tr. 665).

Plaintiff was diagnosed with a headache on December 14, 2011, after he complained of nausea and mild to moderate head pain. (Tr. 668, 671-82). A CT scan of the head was unremarkable as "no acute process [was] seen". (Tr. 677).

At a medication refill appointment on April 16, 2012, Plaintiff reported high blood sugar levels and admitting missing the morning dose of insulin. (Tr. 899, 976, 1147). Later that month, however, he reported taking his insulin as directed. (Tr. 902, 979).

On June 28, 2012, Plaintiff was assessed with "[d]iabetes mellitus without mention of complication". (Tr. 1009-10, 1177-78). His medication Novolin was increased and he was advised to continue use of Glyburide and Metformin as directed. (Tr. 1010, 1178).

At an appointment on August 27, 2012, Plaintiff complained of "some ankle pain" possibly related to exercising. (Tr. 1012, 1187). Medical staff recommended Motrin, ice, stretching, and supportive shoes. (Tr. 1013).

On January 23, 2013, Plaintiff reported taking his medication as directed and checking his blood sugar at home. (Tr. 1037, 1216). He reported levels generally ranging from 230 to 280. (Tr. 1037). He reported no chest pain, palpitations, or shortness of breath. *Id.* A physical examination revealed no abnormalities. (Tr. 1038).

At an appointment on June 12, 2013, it was noted "Patient is compliant with using medication. Patient did not return for a follow-up, or use education materials. He [h]as been managed with oral medications and fingerstick blood sugars . . . . There are no associated symptoms. There are no pertinent negatives." (Tr. 990).

Plaintiff went to the doctor on July 12, 2013, because his blood pressure was 180/111. (Tr. 993, 1245). He was diagnosed with benign essential hypertension. (Tr. 993-94, 1245).

Plaintiff was assessed with dysuria and glycosuria on September 11, 2013. (Tr. 1105, 1259). Later in September 2013, Plaintiff went to urgent care due to a back pain, diabetes, and hypertension. (Tr. 1103, 1261). He was assessed with a backache. *Id.*

On February 19, 2014, Plaintiff complained of insomnia and was referred to a specialist. (Tr. 1110).

Opinion Evidence

On April 10, 2010, medical consultant Benita Jackson-Smoot from disability determination services completed a physical residual functional capacity assessment. (Tr. 421-28). Ms. Jackson-Smoot determined Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; push and/or pull without limitation; never climb a ladder, rope, or scaffolds; occasionally kneel, crouch, and crawl; should avoid concentrated

9

exposure to fumes, odors, dusts, gases, and poor ventilation; and should avoid all exposure to hazards. *Id.*

***State Agency Reviewers***

On March 5, 2012, state agency reviewer Michael Lehv, M.D., determined Plaintiff could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand, walk, or sit for about 6 hours in an 8-hour workday; push/pull without limitation; climb ramps/stairs without limitation; never climb ladders/ropes/scaffolds; balance, stoop, kneel, crouch, or crawl without limitation; and should avoid all exposure to hazards. (Tr. 71-72). Dr. Lehv opined these limitations were due to Plaintiff's atrial fibrillation, anticoagulation, and morbid obesity. *Id.*

On August 31, 2012, a second state agency reviewer, Bradley J. Lewis, M.D., reached the same conclusions except he determined Plaintiff could frequently climb ramps/stairs; occasionally climb ladders/ropes/scaffolds; and frequently stoop and crouch. (Tr. 81-83).

***Consultative Examiners***

Dorothy Bradford, M.D., determined bilateral knee x-rays taken on December 11, 2013, revealed:

> There is moderate [degenerative joint disease] of the patellofemoral joints with hypertrophic spurring. There is considerable narrowing of the medical and lateral joint compartments of both knees with spurring noted medially, laterally due to degenerative disease. There is spurring along the lateral aspects of both distal femora. No joint effusions are seen. There are no fractures or bone destruction. There are no joint effusions opaque loose bodies.

(Tr. 1076).

Bilateral shoulder x-rays showed: "no fractures or bone destruction no soft tissue calcifications. There are minor degenerative changes in the glenohumeral joints without joint space narrowing. The acromioclavicular joints are normal." *Id.*

Dr. Bradford opined Plaintiff had a decreased range of motion due to obesity. (Tr. 1081). She noted he could continuously lift up to 50 pounds, and occasionally up to 100 pounds; and carry up to 20 pounds continuously, up to 50 pounds frequently, and up to 100 pounds occasionally.[4] (Tr. 1082). He could sit for 8 hours at a time without interruption; stand for 1 hour at a time without interruption; walk for 1 hour at a time without interruption; sit, stand, or walk for 8 hours total in an 8-hour workday; use both hands and feet without limitation; never climb ladders or scaffolds, balance, kneel, crouch, or crawl; occasionally stoop; frequently climb stairs and ramps; never be exposed to unprotected heights; frequently be exposed to moving mechanical parts, but had no other environmental limitations; could shop, travel without a companion, ambulate without assistance of a wheelchair, walker, two canes or two crutches, walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed himself; care for personal hygiene, sort handle, and use paper/files. (Tr. 1082-92). Dr. Bradford noted "lifting, carrying, standing, [and] walking are limited due to obesity". (Tr. 1087).

Dr. Bradford also noted Plaintiff's joint pain was due to his morbid obesity and that "[h]e may have intermittent atrial fibrillation but is in normal sinus rhythm today." (Tr. 1092).

J. Joseph Konieczny, Ph.D., conducted a psychological evaluation on December 12, 2013. (Tr. 1094). Dr. Konieczny diagnosed Plaintiff with adjustment disorder with depressed mood. (Tr. 1097). Dr. Konieczny noted that while Plaintiff would have some frustration and diminished coping skills in responding appropriately to supervision and co-workers in the work setting and ability to respond to pressure, he "seem[ed] capable of responding appropriately to

---

4. Continuously is defined as "over 2/3". Occasionally is defined as "up to 1/3". Frequently is defined as "1/3 to 2/3".

normal such situations." *Id.* Plaintiff "appear[ed] capable of managing his own daily activities", but "his overall level of functioning [was] at a slightly reduced level of efficiency due to his perceived physical limitations." *Id.*

Dr. Konieczny opined Plaintiff had no limitations in his ability to understand, remember, and carry out simple instructions, or in his ability to make judgments on simple work-related decisions; and mild limitations in his ability to understand, remember, and carry out complex instructions, and make judgments on complex work-related decisions. (Tr. 1098). He determined Plaintiff would have mild limitations in his ability to interact appropriately with the public, supervisors, and co-workers, and respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 1099).

Hearing Testimony

Plaintiff testified he suffered from hypertension, diabetes, irregular heartbeat, knee problems, shoulder problems, possibly a pinched nerve in his left arm, and sleep apnea. (Tr. 31-32). On a typical day, Plaintiff would wake up and check his sugar levels, make the bed, get dressed, and then "try and find something to do". (Tr. 32). Approximately four or five times a month, he drove his truck to various job sites and transported equipment for his friends (but did not lift the equipment). (Tr. 32-33, 40). Plaintiff estimated he could lift a 50 pounds a few times before becoming exhausted, but had not actually lifted this amount for a few years. (Tr. 40-41). He stated he attempted to gain work in other fields, but "[e]ither there wasn't no call back or said they didn't need no one." (Tr. 43). He attempted to perform past work, but was unable to drywall or paint due to pain. (Tr. 43-44). Plaintiff experienced daily pain of six and a half to seven on a ten-point scale. (Tr. 44).

Plaintiff completed household chores in his attempt to "keep [his] place [as] clean as possible." (Tr. 33). He shopped "sometimes" for "small things", but his girlfriend did his laundry. *Id.* His hobbies included electrical train sets, and fishing with his grandfather before he passed away. (Tr. 34).

Plaintiff could climb stairs, but experienced pain in his knees. *Id.* He had a cane at home, but did not use it and it was not prescribed by a doctor. *Id.* He planned to attend a water aerobics class at a recreation center near his home. (Tr. 37). Plaintiff reported after sitting for approximately an hour he would experience aching in his knees and would need to stretch his legs upon standing. (Tr. 38, 40). He stated doctors told him he was too young for a knee replacement, but did administer injections and prescribe him a brace and pain medication. (Tr. 39). Plaintiff reported shortness of breath when walking for 50 to 75 yards. (Tr. 40). He was able to wash and dress himself, but would experience aching in his legs. (Tr. 42). He was also able to raise both arms above his head. (Tr. 32).

At the hearing, the ALJ posed various hypothetical questions to the VE. The first hypothetical involved a 49-year-old man with a high school education and the same work background as Plaintiff with the following limitations: lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk 6 hours in an 8-hour workday, 1 hour at a time; sit 6 hours in an 8-hour workday; frequently push and pull, but only occasionally use a foot pedal; occasionally use a ramp or stairs, but never a ladder, rope, or scaffold; constantly balance; occasionally stoop, never kneel, occasionally crouch, never crawl; constant manipulative capabilities; constant visual capabilities as corrected with lenses; constant speaking and hearing; who should avoid high concentrations of cold, smoke, fumes, dust, and pollutants; and who should avoid dangerous machinery and unprotected heights. (Tr. 50). The VE opined the

individual would be unable to perform Plaintiff's past work, but would be able to perform other jobs. (Tr. 50-51).

ALJ Decision

In a decision dated March 24, 2014, the ALJ made the following findings of fact and conclusions of law:

1. Mr. Hale has not engaged in substantial gainful activity since his application date of December 21, 2011.

2. Mr. Hale has the following severe impairments: obesity, osteoarthritis, insulin dependent diabetes mellitus, [and] irregular heartbeat.

3. Mr. Hale does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4. After careful consideration of the entire record, I find that Mr. Hale has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except:

   - He can lift of [sic] carry 20 pound [sic] occasionally and 10 pound [sic] frequently, stand or walk for six hours out of eight but only one hour at a time, and sit for six hours out of eight.
   - He can frequently push or pull and occasionally foot pedal.
   - He can occasionally use a ramp or stair, but never a ladder, rope, or scaffold. He can constantly balance, occasionally stoop and crouch, and never kneel or crawl.
   - He has no manipulative, visual, or communications deficits with visual correction.
   - He must avoid high concentrations of extreme cold.
   - He must avoid high concentrations of smoke, fumes, dusts and pollutants.
   - He must avoid exposure to dangerous machinery or unprotected heights.

5. Mr. Hale is unable to perform any past relevant work.

6. Mr. Hale was born on September 30, 1964 and was 47 years old, which is defined as a younger individual age 18-49, on the date he filed the application.

7. Mr. Hale has at least a high school education and is able to communicate in English.

8. Transferability of job skills is not material to the determination of disability as using the Medical-Vocational Rules as a framework supports a finding that Mr. Hale is "not disabled," whether or not he has transferable job skills.

9. Considering his age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform.

10. Mr. Hale has not been under a disability, as defined in the Social Security Act, since December 21, 2011, the date he filed the application.

(Tr. 11-21) (internal citations omitted).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff challenges the ALJ's (1) credibility determination; (2) listing analysis; (3) residual functional capacity determination; and (4) weighing of opinion evidence. (Doc. 14). The Court will address each in turn.

*Credibility Assessment*

Plaintiff asserts "the ALJ found [him] less than credible for several reasons which are without weight." (Doc. 14, at 3). When a claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding regarding the credibility of the statements based on a consideration of the entire record. SSR 96-7p, 1996 WL 374186, *1.

An ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992). Analysis of alleged disabling symptoms turns on credibility. *See Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27 (6th Cir. 2004). "Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms are difficult to prove, disprove, or quantify." SSR 82-58, 1982 WL 31378, *1. In evaluating credibility an ALJ considers certain factors:

(i) [A claimant's] daily activities;

(ii) The location, duration, frequency, and intensity of [a claimant's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, [a claimant] receive[s] or ha[s] received for relief of [Plaintiff's] pain or other symptoms;

(vi) Any measures [Plaintiff] use or ha[s] used to relieve [a claimant's] pain or other symptoms; and

(vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 416.929(c)(3).

17

Ultimately, it is for the ALJ, not the reviewing court, to judge the credibility of a claimant's statements. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (ALJ's credibility determination accorded "great weight"). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. The Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476. The Court may not "try the case de novo, nor resolve conflicts in evidence . . . " *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

Here, with regard to Plaintiff's credibility, the ALJ determined Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, his statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Tr. 18).

First, the ALJ pointed to the consultative examination with Dr. Konieczny in which Plaintiff made statements that were not supported by the record. (Tr. 16-17). He noted Plaintiff appeared to emphasize emotional and physical symptoms, and reported his medications bothered him; however, there was no evidence of complaints of medication side effects at numerous follow-up appointments. (Tr. 16-17, 19) (citing Tr. 1095). Second, the ALJ noted Plaintiff had a long history of complaining of chest pain, but evidence showed "no chest wall tenderness, regular heart rate and rhythm, no edema, and normal pulses." (Tr. 18-19) (citing Tr. 842-44). Third, the ALJ pointed out Plaintiff's "diabetes, hypertension and atrial fibrillation are well controlled" and without complications. (Tr. 19) (citing Tr. 763, 763-948, 842-44). Fourth, he stated Plaintiff's allegation he was unable to lift his arms was inconsistent with Dr. Bradford's

finding of full shoulder range of motion. (Tr. 19-20) While the record does show a full range of motion of shoulder motion (*see* 749, 1079, 1091), the ALJ did not cite to Plaintiff's allegation he was unable to lift his arms. Conversely, at the hearing, Plaintiff stated he could lift his arms over his head. (Tr. 32). While this may not be a well-explained reason for partially discrediting him, other reasons provided adequately account for the credibility determination. Plaintiff further argues the ALJ interpreted his shoulder pain with "unclear etiology" to mean it did not exist; however, there is no basis for this. It appears the ALJ simply recognized Plaintiff's complaints of shoulder pain and noted the record did not establish the origin of such pain. Fifth, the ALJ noted that while Plaintiff alleged disability since 2005 and had no recorded earnings, he admitted to working full time through 2011. (Tr. 20). These examples take into consideration the required factors and support the ALJ's determination Plaintiff's subjective complaints were not entirely credible.

Contrary to Plaintiff's assertion ("when discussing [Plaintiff's] credibility, the ALJ opines on matters outside his area of expertise"), the credibility determination is one for the ALJ. *Cruse*, 502 F.3d at 542. The Court finds the ALJ's credibility determination reasonable and supported by substantial evidence because the record reveals inconsistencies between Plaintiff's statements and the severity of limitations as demonstrated in the record. *Jones*, 336 F.3d at 476.

***Listings***

Plaintiff next asserts his impairments met or medically equal a listing at Step Three, thereby qualifying him for eligibility for consideration at Step Four. (Doc. 14, at 4). Contrary to this this assertion, if a claimant meets or equals the requirements of a listed impairment, then the claimant is considered disabled. 20 C.F.R. § 404.1520(d).

A claimant bears the burden of showing he meets or equals a listing impairment. *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 391 (6th Cir. 1999). In order to determine whether a claimant's impairment meets or is medically equivalent to a listing, the ALJ may consider all evidence in a claimant's record. §§ 404.1520(a)(3), 404.1526(c). In reviewing an ALJ's listing determination, there is no requirement for "heightened articulation" by the ALJ, as long as the finding is supported by substantial evidence. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (citing *Dorton v. Heckler,* 789 F.2d 363, 367 (6th Cir. 1986) (an ALJ's step-three determination is not to be overturned unless it is legally insufficient)).

Here, Plaintiff briefly asserts error in the ALJ's determination his impairments did not meet any listing (including listings 9.00 and 4.05) (Doc. 14, at 7), but fails to meet his burden to show he indeed meets a listing. He simply states "Not only did this finding and conclusion totally ignore the testimony of [Plaintiff], it blatantly disregarded thousands of pages of medical support specifically outlining [Plaintiff's] 'complications, symptoms or clinical signs.'" (Doc. 14, at 7). He offers no evidence, however, showing he meets or medically equals a listing. As such, this undeveloped argument is not well-taken. Further, the ALJ did consider whether his impairments met or equaled a listing—specifically 1.02 (gross dysfunction of a joint), 9.00 (endocrine disorders), and 4.05 (recurrent arrhythmias)—and substantial evidence supports his finding that they did not. (Tr. 17).

***Opinion Evidence***

Plaintiff argues the ALJ erred (1) by giving substantial weight to the opinion of state agency reviewer, Dr. Lewis, "as opposed to [Plaintiff's] actual treating physicians"; (2) assigning great weight to the opinion of consultative examiner, Dr. Konieczny; and (3) in his analysis of the opinion of consultative examiner, Dr. Bradford. (Doc. 14, at 5-6).

20

Under the regulations, there exists a hierarchy of medical opinions: first, is a treating source whose opinion is entitled to deference because it is based on an ongoing treatment relationship; second, is a non-treating source, which are those medical sources who have examined but not treated the Plaintiff; and lastly, is a non-examining source, those who render opinions based on a review of the medical record as a whole. 20 C.F.R. § 416.902.

When evaluating a medical source, an ALJ must weigh medical opinions in the record based on certain factors. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id*.

Non-examining sources are physicians, psychologists, or other acceptable medical sources that have not examined the claimant, but review medical evidence and provide an opinion. 20 C.F.R. § 416.902. The ALJ will consider the findings of these non-examining sources as opinion evidence, except as to the ultimate determination about whether Plaintiff is disabled. *Id.* § 416.927. "[T]he opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight." *Douglas v. Comm'r of Soc. Sec.*, 832 F. Supp. 2d 813, 823-24 (S.D. Ohio 2011). This is because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." *Id.*; § 416.927(d),(f); SSR 96–6p at *2–3. "Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as

treating physicians including supportability, consistency, and specialization." *Douglas*, 832 F.Supp. 2d at 823-24.

Initially, it is important to note the record is devoid of any medical opinion evidence from a treating source. As such, the treating physician rule is not applicable. In the absence of a conflicting treating source opinion, the Court finds the ALJ's analysis of both the state agency reviewer and consultative examiners both appropriate and supported by substantial evidence. The ALJ was only required to consider certain factors when evaluating the opinions of the consultative examiners and the state agency reviewer; he was not required to provide reasons for doing so. *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (holding "the SSA requires ALJs to give reasons for only *treating* source" opinions) (emphasis in original). Nevertheless, the ALJ clearly considered the factors because he provided reasoning for the weight he assigned to various opinions and the overall evidence relating to Plaintiff's impairments, which speak to the consistency and supportability of the opinion. (Tr. 16-21).

### *Residual Functional Capacity Determination*

Plaintiff argues the ALJ erred in his RFC determination when he failed to address Plaintiff's "severe knee impairment", and failed to "take into account [Plaintiff's] limitations outlined by [Dr. Bradford]". (Doc. 14, at 6).

A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. *Id.* § 416.929. The RFC determination is one reserved for the ALJ. *Id.* § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC]

rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5. If the ALJ's decision was supported by substantial evidence, this Court must affirm. *Walters*, 127 F.3d at 528.

Here, the ALJ did take Dr. Bradford's opinion into consideration by assigning it "great weight". (Tr. 19). He explicitly considered knee x-rays showing moderate degenerative joint disease with spurring and shoulder x-rays showing minor degenerative changes. *Id.* He accounted for these limitations in the RFC and Plaintiff has failed to show why the limitations in the RFC fail to adequately account for the objective findings. (Tr. 17-18). Finally, to the extent Plaintiff may challenge the determination regarding other available work in the national economy, an ALJ may rely on a VE's testimony and Plaintiff points to no reason why such reliance was in error here. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004).

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the ALJ's decision supported by substantial evidence, and recommends the Court affirm the Commissioner's decision denying benefits.


     s/James R. Knepp, II
    United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).